[Cite as *Taylor v. BASF Catalysts, L.L.C.*, 2023-Ohio-1136.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

PAMELA TAYLOR,                                    :

    Plaintiff-Appellant,                     :

                                              No. 111535

[Appeal by Thomas W. Bevan and                   :
Bevan and Associates LPA, Inc.]

                                                :

    v.                                           :

BASF CATALYSTS, LLC, ET AL.,                     :

    Defendants-Appellees.                    :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED
**RELEASED AND JOURNALIZED:** April 6, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-17-877307

---

### *Appearances:*

Flowers & Grube, Paul W. Flowers, Louis E. Grube, and
Melissa A. Ghrist, *for appellants.*

Sutter O'Connell Co., James L. McCrystal, Jr., and
Robert E. Cahill; Baker & McKenzie, LLP, and Mark L.
Karasik, *for appellees.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1}     Appellants, Thomas W. Bevan and Bevan and Associates LPA, Inc.

(collectively "Bevan"), appeal from the trial court's judgment awarding sanctions

against them and in favor of defendants-appellees, The Hallstar Company ("Hallstar") and Ester Solutions Company ("Ester") (collectively "appellees"). For the reasons that follow, we reverse the trial court's decision.

## I.   Factual History

{¶ 2}    From the early 1950s until 1977, the C.P. Hall Company ("C.P. Hall") was a distributor of raw asbestos fiber for Johns-Manville Corporation to various businesses in Akron, Ohio, including rubber and tire factories.[1] As such, C.P. Hall had significant exposure to liability as a distributor that supplied raw asbestos. Eventually, there were approximately 15,000 plaintiffs in Ohio and Illinois with asbestos-related claims pending against C.P. Hall. Bevan represented many of those plaintiffs.

{¶ 3}    In 2002, Bevan deposed Thomas C. Seum ("Seum"), who had been an employee of C.P. Hall for 21 years, beginning in 1981. During this deposition, Seum explained the history and growth of C.P. Hall, including its facilities, product lines, asbestos-litigation involvement, and financial health. Seum also explained his advancement within the company and the individuals involved with the company. At the time of deposition, Seum had been the Vice President, Chief Financial Officer of C.P. Hall since 1998 and Secretary for the previous two years. As part of his duties, he was involved in risk management, insurance and claims, and litigation. Seum stated that he had an ownership interest in C.P. Hall, along with Chairman and CEO, George Vincent, and John Paro ("Paro"), C.P. Hall's Chief Operating Officer and

---

[1] One of C.P. Hall's distribution warehouses was located in Stow, Ohio.

Assistant Secretary. According to Seum, Paro was hired in 1986. At that time, Paro incorporated CPH Holding Company ("CPH Holding"), and C.P. Hall became a subsidiary of CPH Holding.

{¶ 4} In September 2009, Bevan deposed Patrick Michael Shine ("Shine"), who was President of C.P. Hall at the end of February 2009. In this deposition, Bevan learned that Paro, as President of Hallstar, had contacted Shine to handle the insurance claims for C.P. Hall. Shine stated, "I was contacted to see if I was interested in * * * using my expertise to maximize insurance coverage returns for an entity that basically exists to litigate and resolve asbestos claims." During this deposition, Shine said that he understood that C.P. Hall was a Hallstar subsidiary and Paro was an officer with Hallstar.

{¶ 5} When asked whether there were any other C.P. Hall employees when he started working for C.P. Hall, Shine stated, "Well, before the transaction, before Hall Star [sic] — while, it was still part of Hall Star [sic], I don't know, but when I became part of it, I was the only one." When asked to clarify what he meant by "transaction," Shine stated, "The one where we took the C.P. Hall assets and liabilities, acquired them from Hall Star [sic]." He said this occurred on February 20, 2009, and involved a purchase agreement ("Stock Purchase Agreement") between the newly formed CPH Acquisition Company ("CPH Acquisition") and Hallstar.[2] He stated that under the agreement, CPH Acquisition is the sole owner of C.P. Hall.

---

[2] It appears from the transcript that this was the first time Bevan may have learned of this agreement.

When asked whether either party paid each other pursuant to the agreement, Shine responded, "No, it was a cashless transaction." He stated that he believed that at the time of this Stock Purchase Agreement, Hallstar owned C.P. Hall. During this deposition, Shine confirmed that he had separate counsel during the acquisition of C.P. Hall stock, and that he created the company CPH Acquisition, but that his employer is C.P. Hall. Finally, Shine said that it was his understanding that Hallstar took over C.P. Hall in the 1980s and that C.P. Hall at some point only existed to handle asbestos-related exposure claims.

{¶ 6}   Based on the information obtained, Bevan filed a lawsuit in Summit County, Ohio that is relevant to this appeal.

## II.   Procedural Background

### A. The Prior Lawsuits

#### 1. The *Bennett* Lawsuit

{¶ 7}   In August 2010, Bevan filed a complaint on behalf of its client alleging asbestos-related exposure claims against multiple defendants, including "The Hallstar Company Individually and as Successor-in-Interest to The C.P. Hall Company," "Ester Solutions Company," and "The C.P. Hall Company." *See Bennett v. The Hallstar Co., et al.*, Summit C.P. No. AC-2010-08-5739 ("*Bennett*"). The complaint alleged that the plaintiff's decedent was exposed to asbestos as a result of his employment at General Tire from 1953 to 1988. The complaint further alleged that the named defendants used, manufactured, supplied, or distributed asbestos to

General Tire during that time frame and that those asbestos-containing products caused the plaintiff's decedent's injury.

{¶ 8} During discovery, Hallstar produced the February 20, 2009 Stock Purchase Agreement. The Agreement provided that CPH Acquisition purchased from Hallstar Sales Corporation the "sole outstanding share of capital stock of" C.P. Hall for $700,000. Shine signed the agreement on behalf of the buyer, CPH Acquisition; Paro, as vice-president, signed the agreement on behalf of the seller, Hallstar Sales; and Vincent, as president of C.P. Hall, signed on its behalf. Hallstar also produced an unsigned and incomplete copy of the Escrow Agreement, evidencing the same as the Stock Purchase Agreement. From the face of the document, neither Hallstar nor Ester were named as parties to either agreement.

{¶ 9} In 2011, Bevan deposed Paro, Hallstar's CEO, in connection with this lawsuit. He testified about his 25-year tenure with Hallstar. He explained his advancement in the company and the growth of the company. He stated that Hallstar was known as CPH Holding Company when it was incorporated in 1986. At the time of incorporation, CPH Holding had two subsidiaries — Hallstar International and C.P. Hall. Prior to the 2004 reorganization, CPH Holding had four subsidiaries — Hallstar International, CPH Sub, CPH Sub 2, and C.P. Hall.

{¶ 10} Paro explained the justification and purpose of CPH Holding's reorganization in 2004. He said that as a result of the reorganization, multiple subsidiaries were formed, including what are now known as Hallstar Services Corporation, Hallstar Solutions, and Hallstar Sales. In 2007 and under the direction

of Paro, CPH Holding changed its name to Hallstar. According to Paro, in 2010, the total revenue for Hallstar and all of its subsidiaries was approximately $100 million.

{¶ 11} Regarding Ester, Paro testified that Hallstar owns Ester, but that Ester is a subsidiary of Hallstar Solutions. He testified further that C.P. Hall's Stow warehouse became an asset of Ester when Ester was formed in 2004 as part of the reorganization. Paro denied that the only consideration paid by Ester to C.P. Hall for the warehouse was $10.00, as noted on the quitclaim deed executed by C.P. Hall. According to Paro, C.P. Hall transferred the warehouse, along with the substantial mortgage, to Ester. Paro stated that in exchange, C.P. Hall received a reduction in its liability that was equal to or greater than the amount of the asset. As for Ester's employees, Paro testified that C.P. Hall originally employed those employees, and that Ester continued to perform some of the business that C.P. Hall performed prior to the transfer.

{¶ 12} Paro seemed skeptical of Seum's deposition testimony regarding C.P. Hall's assets in 2002, i.e., that C.P. Hall had $12 million in real estate and $8 million in inventory. Paro stated that those figures were now unverifiable because when C.P. Hall was sold, those records would have been transferred to CPH Acquisitions.

{¶ 13} He testified that CPH Holding owned C.P. Hall until 2004, and that after the company's reorganization in 2004, C.P. Hall was owned by what is now Hallstar Sales. He stated that in 2009, Hallstar Sales sold C.P. Hall to CPH Acquisitions. Paro stated that despite the sale to CPH Acquisitions, Hallstar Services

retained responsibility for the CPH retirement plan and retirees of C.P. Hall because "it was the right thing to do."

{¶ 14} In the *Bennett* lawsuit, both Hallstar and Ester each individually moved for summary judgment, contending that no genuine issue of material fact existed proving that the decedent was exposed to asbestos from any product manufactured or supplied by them because (1) neither entity produced or distributed asbestos or an asbestos-containing product; and (2) plaintiff failed to identify a single product-identification witness. Hallstar did not raise any argument regarding successor liability. Two months later, in November 2011, Bevan dismissed the complaint without prejudice pursuant to Civ.R. 41(A)(1) against all defendants. According to Bevan, the case was dismissed because they were unable to find a co-worker at General Tire who could testify about the decedent's occupational exposure to asbestos.

### 2. The *Clark* Lawsuit

{¶ 15} On October 5, 2011, Bevan filed a complaint on behalf of its client, alleging asbestos-related claims against 37 defendants, in the Summit County Court of Common Pleas styled *Clark v. Akron Gasket Ents., Inc.*, Summit C.P. No. AC-2011-10-5614 ("*Clark*"). The complaint named Hallstar, individually and as successor-in-interest to C.P. Hall, and Ester, individually.[3] It alleged that the plaintiff's spouse, the decedent, was exposed to asbestos as a result of plaintiff's exposure during his

---

[3] Marine Magnesium & Minerals and RTD Hallstar, alleged Hallstar affiliates or subsidiaries, were also named as defendants.

employment at AP Green from the mid 1960s to 1981, and from the decedent's exposure through her own employment at Perry Rubber in the 1970s. The complaint alleged that the named defendants used, manufactured, supplied, or distributed asbestos-containing automotive products during that time frame, and those asbestos-containing products caused the decedent injury.

{¶ 16} In November 2011, before any discovery was conducted, Hallstar and Ester moved to dismiss the complaint pursuant to Civ.R. 12(B)(6), contending that the complaint failed to make any factual allegations that the plaintiff's decedent was exposed to an asbestos-containing product of the defendants and that despite Hallstar being named as a successor-in-interest to C.P. Hall, the complaint contained no factual allegations supporting this assertion.[4] In July 2012, Bevan voluntarily dismissed Hallstar and Ester without prejudice pursuant to Civ.R. 41(A)(1). According to Bevan, the complaint was dismissed following the deposition of the plaintiff because he could not provide any testimony regarding the decedent's exposure at Perry Rubber. Subsequently all defendants, including Hallstar and Ester, related to Perry Rubber were dismissed.

### 3. The *Schwab* Lawsuit

{¶ 17} On November 1, 2011, Bevan filed a master-consolidated complaint on behalf of its client alleging asbestos-related claims against 110 defendants in the Cuyahoga County Court of Common Pleas styled *Schwab v. Goodrich Corp.*,

---

[4] Marine Magnesium & Minerals Company and RTD Hallstar were also movants under this motion.

Cuyahoga C.P. No. CV-11-768171 ("*Schwab*"). Bevan named Hallstar individually and as successor-in-interest to C.P. Hall; Ester, individually; and RTD Hallstar in connection with the Brazelton plaintiff only. The complaint alleged that Brazelton worked for the BF Goodrich plant in Brecksville from 1951-1991, and that C.P. Hall supplied BF Goodrich with asbestos or asbestos-containing products to which Brazelton was exposed.

{¶ 18} Hallstar immediately sought to remove this action from the common pleas court to federal court, predicated, in part, on diversity of citizenship. According to Bevan, the plaintiff did not want to pursue the matter in federal court and therefore, Hallstar, Ester, and RTD Hallstar were dismissed from the case with prejudice pursuant to Fed.R.Civ.P. 41(a).

### 4. The Illinois Lawsuits

{¶ 19} In 2010, Hallstar was named as a defendant in two lawsuits ("the Illinois lawsuits") in a Circuit Court of the Eleventh Judicial Circuit in the state of Illinois, McLean County, ("Illinois court") *Decker/Stewart v. Hallstar,* Case No. 10-L-177, and *Whittington v. Hallstar,* Case No. 12-L-101 I, in which it was alleged that Hallstar was a successor to CPH Holding and C.P. Hall.[5] Bevan was not counsel for the plaintiffs in these lawsuits.

---

[5] These case captions may not be as they would appear in the Illinois court. The journal entries attached as exhibits to appellees' motions for summary judgment and sanctions only address Hallstar as a defendant. However, the case caption of the subsequent transcript of the sanctions ruling identifies "Honewell [sic] International" as the lead defendant.

{¶ 20} In 2013, Paro gave deposition testimony in connection with the Illinois lawsuits. In his deposition, Paro agreed that Hallstar was not named in asbestos-exposure lawsuits until CPH Acquisitions purchased C.P. Hall and that C.P. Hall subsequently filed for bankruptcy. He stated that at the time of the purchase, Hallstar did not own C.P. Hall directly but rather, that Hallstar Sales owned C.P. Hall, which was "wholly owned by CPH Holding." (Tr. 66.)[6]

{¶ 21} Despite Shine's 2009 deposition testimony that the transfer of assets and liabilities from C.P. Hall to CPH Acquisition was a "cashless transaction," Paro testified that Hallstar Sales sold C.P. Hall for $700,000, which was made in a single payment. Paro again denied that Hallstar owned C.P. Hall.

{¶ 22} Hallstar moved for summary judgment against the Illinois plaintiffs. The resolution of that motion will be discussed later in this opinion.

### 5. The *Blakely* Lawsuit

{¶ 23} On July 7, 2014, Bevan filed a complaint on behalf of its clients, alleging asbestos-related claims against twenty named defendants, including Hallstar and Ester, in the Summit County Court of Common Pleas styled *Blakely v. Goodyear Tire & Rubber Co.*, Summit C.P. No. AC-2014-07-3155 ("*Blakely*"). In *Blakely*, Bevan named Hallstar and Ester in both their individual capacities and as successors-in-interest to C.P. Hall. The complaint alleged that plaintiff was exposed to asbestos as a result of his employment at Goodyear Aerospace Corporation in

---

[6] At the time of sale in 2009, CPH Holding had already changed its name to "Hallstar."

1967-1968 and Chapel Hill Maintenance from 1974 to 2001, and from exposure to asbestos and asbestos-containing products through repair and renovation work performed on his own home and vehicles. The complaint alleged that the named defendants, agents, servants, or predecessors used, manufactured, installed, supplied, or distributed asbestos-containing products and that those asbestos-containing products caused the plaintiff injury.

{¶ 24} As in the *Clark* lawsuit, Hallstar moved to dismiss the complaint pursuant to Civ.R. 12(B)(6), contending that the complaint failed to make any factual allegations that the plaintiff was exposed to an asbestos-containing product of Hallstar and that despite being named as a successor in interest, there were no factual allegations that Hallstar holds successor liability for C.P. Hall.

{¶ 25} The *Blakely* Court permitted Bevan to file multiple amended complaints that provided detailed allegations against each specific defendant, including Hallstar and Ester. Additionally, the amended complaints set forth factual allegations supporting the claim that Hallstar and Ester were successors in interest and regarding the liability of C.P. Hall. The amended complaint then asserted two detailed claims — (1) to pierce the corporate veil to hold Hallstar and Ester liable for C.P. Hall, and (2) that Hallstar and Ester conspired with C.P. Hall to fraudulently convey C.P. Hall's assets.

{¶ 26} Subsequently, in 2015, the *Blakely* Court permitted Bevan to amend the complaint as to Ester only to include additional allegations supporting its claim that Ester was liable as a successor in interest to C.P. Hall and that it conspired with

Hallstar to fraudulently convey C.P. Hall's assets. The amended complaint added an additional claim that the exceptions to the rule of non-liability of successors applied.

{¶ 27} In May 2015, Bevan again deposed Paro. During that deposition, Paro emphatically denied the allegation that CPH Acquisition was formed in 2009 to assume the liabilities of C.P. Hall from Hallstar. Paro explained:

> The corporation that bought the C.P. Hall Company from Hallstar Sales Corporation was in the business of insurance archeology. The possibilities for continued insurance findings in that company were substantial. They bought that company based on the fact that there were a lot more insurance to be had and that they were experts in running those kinds of archeological programs, far greater than any expertise that was owned inside the Hallstar Sales Corporation or the people when we were involved. It was not to get rid of any liabilities. It was put in the hands of people who managed those kind of businesses.

(Paro, May 15, 2015 deposition, p. 116-117). C.P. Hall subsequently filed for bankruptcy following the sale to CPH Acquisitions.

{¶ 28} On May 29, 2015, Hallstar and Ester filed individual motions for summary judgment, both arguing that the *Blakely* plaintiff failed to raise a genuine issue of material fact as to whether he was exposed to and injured as a proximate result of a C.P. Hall product that could somehow be imputed to Hallstar and Ester. Relying on the 2009 Stock Purchase Agreement and Paro's deposition testimony and affidavit, Hallstar and Ester argued that the *Blakely* plaintiff could not establish that they were successors to C.P. Hall and that the claims of fraudulent transfer were barred by Ohio's applicable statute of limitations under R.C. 1336.09. Paro averred in his supporting affidavit that Hallstar Solutions is a subsidiary of Hallstar and that Ester is a subsidiary of Hallstar Solutions. He also averred that Hallstar "'has never

directly or indirectly' 'engaged in any business dealing or business activity dealing with asbestos,' [and that it] is not the 'alter ego' or 'successor' of C.P. Hall and bears no successor liability of any type or kind for C.P. Hall."

{¶ 29} Blakely opposed both motions for summary judgment, contending that genuine issues of material fact existed regarding whether either or both of these companies are successors of C.P. Hall. Hallstar and Ester each filed a reply brief, asserting that Blakely's allegations did not create a genuine issue of material fact, and each reasserted their respective position that neither company is a successor of C.P. Hall. On July 23, 2015, the *Blakely* Court conducted a hearing on the motions.

{¶ 30} Shortly after this hearing on August 6, 2015, the Illinois court issued its decisions in the Illinois lawsuits on Hallstar's pending motions for summary judgment regarding whether Hallstar was the successor of C.P. Hall. The Illinois court found that based on its record and the evidence presented, Hallstar was not a successor of C.P. Hall and thus, it found no successor liability.

{¶ 31} Hallstar and Ester supplemented the *Blakely* record with the August 6, 2015 hearing transcript and the Illinois court's written orders granting Hallstar summary judgment in the Illinois lawsuits.

{¶ 32} On August 11, 2015, counsel for Hallstar and Ester emailed Bevan requesting that Bevan dismiss the *Blakely* lawsuit and asserting that Civ.R. 11 sanctions were being considered. In the email exchange, Bevan explained its position and belief regarding why Hallstar and Ester are successors to C.P. Hall and that the sale and acquisition of C.P. Hall fell under one of the legal exceptions to non-

successor liability. Counsel for Hallstar and Ester responded that the Illinois court had considered the same evidence Bevan was asserting and found against Bevan's position. In response, Bevan reiterated its belief that the facts support its position that at least Ester falls under a legal exception to non-successor liability. Additionally, Bevan noted that the "Illinois decision, based on different successor liability rules[,] did not address Ester."

{¶ 33} On September 11, 2015, Bevan dismissed without prejudice the *Blakely* lawsuit against Hallstar and Ester. According to Bevan, the decision was based on ongoing discovery problems and the complexity of the issues, which threatened significant delays and diverted attention away from plaintiff's case against Goodyear.

{¶ 34} In response, Hallstar and Ester jointly moved for sanctions against Bevan pursuant to R.C. 2323.51 and Civ.R. 11, contending that Bevan acted in bad faith by filing a frivolous lawsuit against them when the evidence revealed that neither Hallstar nor Ester were parties to the 2009 Stock Purchase Agreement and Paro unequivocally denied that either company was a successor to C.P. Hall. They argued further that Bevan's decision to "once again" dismiss the case pursuant to Civ.R. 41 did not absolve its conduct of filing the frivolous lawsuit.

{¶ 35} On March 1, 2016, following a hearing, the *Blakely* Court issued a written decision denying appellees' motion for sanctions. The decision thoroughly explained Bevan's litigation practice and history involving C.P. Hall, Hallstar, and Ester. The court concluded that based on the record before it, the arguments

provided by counsel, and the law on successor liability, Bevan's prosecution of the claims against Hallstar and Ester were not frivolous under R.C. 2323.51(A)(2). The court acknowledged in a footnote that an "out-of-state" court had concluded that "these defendants" are not successors in interest of C.P. Hall but it found that this "precedent" did not exist when Bevan filed the *Blakely* complaint.

{¶ 36} The court further found that Bevan's "eleventh-hour" voluntary dismissal could not be deemed frivolous under R.C. 2323.51 because a party has an absolute right to one dismissal without prejudice under Civ.R. 41(A)(1)(a). Finally, the *Blakely* Court found that sanctions were not warranted under Civ.R. 11 because no evidence was presented supporting this claim, but even assuming the issue, no evidence supported a finding that Bevan's conduct was deliberate, intentional, or purposeful.

{¶ 37} Neither Hallstar nor Ester appealed this decision.

### B. The Underlying Lawsuit

{¶ 38} On March 13, 2017, Bevan, together with Hutton Sentell attorneys practicing in Dallas, Texas, filed a wrongful death and survivorship action on behalf of its client, Pamela Taylor, individually and as personal representative of the Estate of Robert Taylor, deceased (hereinafter "Taylor" or "plaintiff"). The complaint alleged that Taylor's late husband, Robert, had died in 2016 from mesothelioma after being exposed to asbestos fibers. The complaint alleged that Robert came into contact with the carcinogen through his late father, who had unknowingly brought the cancerous fibers home with him on his person and clothing from the Firestone

Tire Plant in Akron, Ohio where he worked as a laborer and machine operator between 1953 and 1971.

{¶ 39} The complaint named multiple defendants, all of whom were believed to have played a substantial role in the widespread asbestos exposure at the Firestone Tire Plant during the relevant time period. Much like in the prior lawsuits, the complaint named Hallstar and Ester individually and as successors-in-interest to C.P. Hall. The seventh cause of action pertained solely to C.P. Hall, Hallstar, and Ester. The complaint alleged that C.P. Hall supplied raw asbestos and talc to the Firestone Tire Plant where the plaintiff's decedent's late-father worked and was exposed to asbestos or asbestos-containing products. The complaint alleged that asbestos fibers were unknowingly carried home on clothing, thereby exposing plaintiff's decedent to those fibers.

{¶ 40} Paragraphs 46-52 of the complaint set forth the specific allegations regarding Hallstar and Ester's alleged successor interest and liability.

46. C.P. Hall Company was owned by The Hallstar Company.

47. In 2002, C.P. Hall Company owned substantial real property in the form of a manufacturing facility in Bedford Park, Illinois, a warehouse and office facility in Bedford Park, Illinois, a warehouse and office in Stow, Ohio, a blending operation warehouse and office in Memphis, Tennessee, a warehouse in Anderson, South Carolina, and a plant in Carteret, New Jersey. C.P. Hall Company employed 183 employees and C.P. Hall Company's gross sales totaled $84 million dollars.

48. In 2004, C.P. Hall Company was gone and Ester Solutions Company appeared in its place, in the same building in Ohio.

49. Ester Solutions Company is 100% owned by The Hallstar Company, the owner of C.P. Hall Company. Ester Solutions Company operates

out of the same warehouse in Stow, Ohio, that was formerly C.P. Hall Company.

50. Plaintiff asserts a claim that Ester Solutions Company is liable as a successor in interest to C.P. Hall Company:

a. Ester Solutions Company falls under multiple exceptions to the rule of non-liability:

i. The transaction amounted to a defacto consolidation or merger as C.P. Hall Company was no longer operating and all its assets belonged to Ester Solutions Company;

ii. The buyer corporation is merely a continuation of the seller corporation as all employees, officers, and shareholders of C.P. Hall Company in Ohio became employees, officers and shareholders of Ester Solutions Company;

iii. The transaction was entered into fraudulently with The Hallstar Company as detailed in paragraphs 51 and 52.

51. Ester Solutions Company conspired with The Hallstar Company to fraudulently convey the assets of C.P. Hall Company to Ester Solutions Company:

a. C.P. Hall Company was owned by The Hallstar Company. Ester Solutions Company is owned by The Hallstar Company now;

b. C.P. Hall Company had been sued or threatened with suit in numerous asbestos cases;

c. The transfers made by The Hallstar Company and accepted by Ester Solutions Company of the assets of C.P. Hall Company were of all or substantially all of C.P. Hall Company's assets in a short time span;

d. C.P. Hall Company became insolvent following these transfers;

e. The value of consideration paid by The Hallstar Company and Ester Solutions Company of $700,000.00 for C.P. Hall Company's assets was not reasonably equivalent to the value of

the assets transferred as indicated above was just over $84 million dollars only a few years earlier;

f. Ester Solutions Company continued to control the assets of C.P. Hall Company that it acquired;

g. Plaintiff, such as Pamela Taylor, is unable to collect from C.P. Hall Company as it filed for bankruptcy shortly after its assets were disbursed by The Hallstar Company to Ester Solutions Company.

52. The Hallstar Company fraudulently conveyed the assets of C.P. Hall Company to Ester Solutions Company:

a. C.P. Hall Company was owned by The Hallstar Company. Ester Solutions Company is now owned by The Hallstar Company;

b. C.P. Hall Company had been sued or threatened with suit in numerous asbestos cases;

c. The transfers made by The Hallstar Company and accepted by Ester Solutions Company of the assets of C.P. Hall Company were of all or substantially all of C.P. Hall Company's assets in a short time span;

d. C.P. Hall Company became insolvent following these transfers;

e. The value of consideration paid by The Hallstar Company of $700,000.00 for C.P. Hall Company's assets was not reasonably equivalent to the value of the assets transferred as indicated above was just over $84 million dollars only a few years earlier;

f. The Hallstar Company simply pulled the assets of its wholly owned subsidiary, C.P. Hall Company, and transferred them to a "new" corporation called Ester Solutions Company that was located in the same building, and had the same shareholders, officers, and employees as The C.P. Hall Company;

g. Ester Solutions Company continued to control the assets of C.P. Hall Company that it acquired;

h. Plaintiff, such as Pamela Taylor, is unable to collect from C.P. Hall Company as it filed for bankruptcy shortly after its assets

were disbursed by The Hallstar Company to Ester Solutions Company.

{¶ 41} Hallstar and Ester, represented by the same counsel as in prior lawsuits, filed separate notices of appearance, which pursuant to the trial court's Amended Standing Orders, constitutes a denial of all averments in the complaint and asserts allegations of all affirmative defenses. Thereafter, Hallstar and Ester jointly defended this lawsuit, including submitting and responding to discovery requests.

{¶ 42} On July 13, 2018, Hallstar and Ester jointly moved for summary judgment, contending that no genuine issues of material fact existed and they were entitled to judgment as a matter of law because (1) the statute of limitations had expired to challenge any alleged fraudulent transfer; (2) plaintiff could not establish that either Hallstar or Ester are successors of C.P. Hall; and (3) plaintiff could not establish the causal connection of exposure or injury to the decedent by an asbestos-containing C.P. Hall product.

{¶ 43} In support, Hallstar and Ester relied upon the February 20, 2009 Stock Purchase Agreement and Escrow Agreement, to assert that the statute of limitations commenced on that date regarding any alleged fraudulent transfer action under R.C. Chapter 1336. Additionally, they relied on Paro's deposition testimony unequivocally denying (1) the existence of successor liability because neither Hallstar nor Ester were a party to the sale of C.P. Hall stock to CPH Acquisitions, and (2) that appellees were successors of C.P. Hall.

**{¶ 44}** Hallstar and Ester also supported their summary judgment motion with the decisions from the Illinois lawsuits that granted Hallstar's motions for summary judgment against plaintiffs' exposure-related personal injury claims and allegations that Hallstar is liable as successor of CPH Holding and C.P. Hall. The Illinois court found that based on the facts presented, "there is no successor liability."

**{¶ 45}** Despite the trial court granting Bevan's request for an extension to respond to "defendants' motions for summary judgment" — which included appellees' pending summary judgment motion — no response was filed.

**{¶ 46}** On August 30, 2018, appellees filed an entry of judgment and reply brief in support of their unopposed motion for summary judgment. In their motion, appellees noted that despite receiving an extension, plaintiff had not opposed the motion nor sought an additional extension to respond. Accordingly, appellees maintained they were entitled to judgment as a matter of law.

**{¶ 47}** Appellees' unopposed summary judgment motion remained pending on the trial court's docket for approximately seven months before Bevan voluntarily dismissed the case on March 18, 2019, against all remaining defendants, including appellees.

**{¶ 48}** On April 11, 2019, appellees timely moved for sanctions against Bevan pursuant to R.C. 2323.51 and Civ.R. 11, contending that Bevan's continued conduct of bringing lawsuits against them supported by "unfounded and baseless allegations" of successor liability amounted to harassment. Appellees maintained that sanctions were warranted because despite being on notice that the Illinois court found no

successor liability between Hallstar and C.P. Hall and being "cautioned" by the *Blakely* Court about this determination, Bevan initiated the current lawsuit against appellees asserting, yet again, that both Hallstar and Ester are successors of C.P. Hall. According to appellees, Bevan had engaged in a "blatant abuse of the judicial process" by once again voluntarily dismissing appellees from the lawsuit before any ruling could be made by the trial court on whether successor liability existed. Appellees asserted that sanctions were necessary to stop Bevan's "reckless approach to litigation."

{¶ 49} Bevan opposed the motion, contending that it had a good-faith belief that Hallstar and Ester are successors of C.P. Hall. Bevan maintained it only dismissed the case against appellees because it was unable to establish the causal connection of exposure or injury to the decedent by an asbestos-containing C.P. Hall product. As for appellees' contention that Bevan was on notice by the Illinois decision that no successor liability existed, Bevan explained that the 2009 Stock Purchase Agreement is not definitive proof under Ohio law that neither Hallstar nor Ester were successors of C.P. Hall. Additionally, it maintained that the Illinois court's determination was not binding because those decisions did not involve Ohio law nor disclose what evidence was before the Illinois court in rendering those decisions. Bevan explained each of the prior lawsuits, discussed what justification it had in bringing the lawsuits, and identified why each had been dismissed.

**{¶ 50}** After receiving leave of court, appellees filed a reply in support of their motion for sanctions. Thereafter, the motion for sanctions remained pending until June 2021, when appellees renewed their request for a hearing.

**{¶ 51}** On September 14, 2021, the trial court conducted a hearing on appellees' motion. During the hearing, appellees reasserted their belief that Bevan's conduct amounted to harassment when it filed another lawsuit against them and then dismissed the action before the court could make a determination on successor liability. According to appellees, the lawsuit was frivolous because the Illinois lawsuits finally resolved the issue that Hallstar was not a successor to C.P. Hall.

**{¶ 52}** In response, and citing relevant case law and conflicting deposition testimony, Bevan explained to the trial court why it believed Hallstar and Ester are successors to C.P. Hall. Although Bevan could not explain at the hearing why the Illinois court's ruling was not legally distinguishable, i.e., the legal difference between Illinois's and Ohio's successor liability laws, Bevan reiterated its position that the decision was not binding authority and further, that it did not address Ester.

**{¶ 53}** The trial court took the matter under advisement.

**{¶ 54}** On January 25, 2022, the trial court issued a three-paragraph decision granting appellees' motion for sanctions. Relying on the Illinois court's conclusion that Hallstar is not a successor in interest to C.P. Hall, the trial court found that Bevan's "persistent harassment of the [appellees] is clear." The court scheduled the matter for a hearing on legal fees.

{¶ 55} On February 16, 2022, a hearing commenced on the determination of the sanction amount. Appellees provided copies of legal fees and expenses incurred by both their Ohio and Chicago attorneys. The fees submitted on behalf of appellees' Chicago attorneys, however, were not produced prior to the hearing and were submitted under seal to the trial court with certain portions of the billing statements redacted. Despite the court's receipt of itemized billing statements from appellees, their Chicago-based attorney proposed that the court adopt "a blended rate which takes into account local counsel's rate and our rate and use $500 per hour for 500 hours of work that justifies a $250,000 award."

{¶ 56} On May 2, 2022, the trial court issued a written order awarding judgment in favor of appellees in the amount of $250,000 plus costs. On May 18, 2022, the trial court issued an order finding that appellees supported their legal fees with "appropriate and thorough factual dates in the affidavits of counsel * * * to defend the baseless claims filed by Mr. Bevan." The court rejected Bevan's notion that sworn affidavits are insufficient to prove the reasonableness of appellees' request for fees, citing this court's decision in *Metron Nutraceuticals, L.L.C. v. Thomas*, 8th Dist. Cuyahoga No. 110280, 2022-Ohio-79. Accordingly, the court reiterated its judgment for appellees in the amount of $250,000 plus costs.

{¶ 57} That same day, the court issued a final judgment entry "in favor of The Hallstar Company and Hallstar Ester Solutions Company jointly and severally against Thomas Bevan and Bevan & Associates, LPA, Inc. in the amount of $250,000 plus costs."

{¶ 58} Bevan now appeals, raising four assignments of error.[7]

## III. Was the Trial Court's Decision Unreasonable?

### A. Sanctionable Conduct

{¶ 59} In its first assignment of error, Bevan contends that the trial court erred as a matter of law, and otherwise committed an abuse of discretion, by concluding that it had engaged in sanctionable conduct under R.C. 2323.51 and Civ.R. 11.

{¶ 60} Under R.C. 2323.51, a trial court may award attorney fees to a party aggrieved by frivolous conduct in a civil action. *Grimes v. Oviatt*, 2019-Ohio-1365, 135 N.E.3d 378, ¶ 18 (8th Dist.). A motion for sanctions under this statute requires a court to determine whether the challenged conduct constitutes frivolous conduct as defined in the statute, and, if so, whether such conduct has adversely affected any party. *Musial Offices, Ltd. v. Cuyahoga Cty.*, 8th Dist. Cuyahoga No. 108810, 2021-Ohio-2325, ¶ 15, citing *Riston v. Butler*, 149 Ohio App.3d 390, 2002-Ohio-2308, 777 N.E.2d 857, ¶ 17 (1st Dist.).

{¶ 61} R.C. 2323.51(A)(2)(a) defines "frivolous conduct" as conduct that satisfies any of the following subsections:

> (i) It obviously serves merely to harass or maliciously injure another party to the civil action or appeal or is for another improper purpose, including, but not limited to, causing unnecessary delay or a needless increase in the cost of litigation.

> (ii) It is not warranted under existing law, cannot be supported by a good faith argument for an extension, modification, or reversal of

---

[7] The trial court granted Bevan's request to stay, conditioned on the posting of a $375,000 cash deposit with the clerk of courts.

existing law, or cannot be supported by a good faith argument for the establishment of new law.

(iii) The conduct consists of allegations or other factual contentions that have no evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

(iv) The conduct consists of denials or factual contentions that are not warranted by the evidence or, if specifically so identified, are not reasonably based on a lack of information or belief.

{¶ 62} In *State ex rel. DiFranco v. S. Euclid*, 144 Ohio St.3d 571, 2015-Ohio-4915, 45 N.E.3d 987, the Supreme Court of Ohio stated that "frivolous conduct * * * must involve egregious conduct." *Id.* at ¶ 15. "Frivolous conduct is not proved merely by winning a legal battle or by proving that a party's factual assertions were incorrect." *Id.*, citing *Ohio Power Co. v. Ogle*, 4th Dist. Hocking No. 12CA14, 2013-Ohio-1745, ¶ 29-30. Moreover, R.C. 2323.51 was not intended to punish mere misjudgment or tactical error. *Musial* at ¶ 17, citing *Turowski v. Johnson*, 70 Ohio App.3d 118, 123, 590 N.E.2d 434 (9th Dist.1991).

{¶ 63} "R.C. 2323.51 was designed to chill egregious, overzealous, unjustifiable, and frivolous action. * * * [A] claim is frivolous if it is absolutely clear under the existing law that no reasonable lawyer could argue the claim." *Ogle* at ¶ 29. It serves to deter abuse of the judicial process by penalizing sanctionable conduct that occurs during litigation. *Musial* at ¶ 17, citing *Filonenko v. Smock Constr., L.L.C.*, 10th Dist. Franklin No. 17AP-854, 2018-Ohio-3283, ¶ 14.

{¶ 64} R.C. 2323.51 applies an objective standard in determining frivolous conduct, as opposed to a subjective one. *Musial* at *id.*, citing *Bikkani v. Lee*, 8th Dist.

Cuyahoga No. 89315, 2008-Ohio-3130, ¶ 22. "The finding of frivolous conduct under R.C. 2323.51 is determined without reference to what the individual knew or believed." *Id.*, citing *Ceol v. Zion Indus., Inc.*, 81 Ohio App.3d 286, 289, 610 N.E.2d 1076 (9th Dist.1992).

{¶ 65} Civ.R. 11, which governs the signing of pleadings, motions, and other documents, provides in pertinent part,

> The signature of an attorney * * * constitutes a certificate by the attorney * * * that the attorney * * * has read the document; that to the best of the attorney's * * * knowledge, information, or belief there is good ground to support it; and that it is not interposed for delay. * * * For a willful violation of this rule, an attorney * * * may be subjected to appropriate action, including an award to the opposing party of expenses and reasonable attorney fees incurred in bringing any motion under this rule.

{¶ 66} When a party files a motion for sanctions under Civ.R. 11, the trial court must determine whether the attorney who signed the document: "(1) has read the pleading, (2) harbors good grounds to support it to the best of his or her knowledge, information, and belief, and (3) did not file it for the purposes of delay." *Ceol v. Zion Indus., Inc.*, 81 Ohio App.3d 286, 290, 610 N.E.2d 1076 (9th Dist.1992). If the trial court finds the attorney did not satisfy one of the above requirements, the next inquiry is whether the violation was willful or simply negligent. *Id.* Where the attorney's actions are willful, the trial court may impose sanctions. *Id.* The trial court imposes a subjective "bad faith" standard when determining whether the violation was willful. *Id.* at 291.

**{¶ 67}** The purpose of Civ.R. 11 sanctions is to deter abusive pleading and motion practice and to assure the court that those filings were submitted in good faith and with sufficient support. *D.L.M. v. D.J.M.*, 8th Dist. Cuyahoga No. 107992, 2019-Ohio-4574, ¶ 28. Sanctions under Civ.R. 11 are determined on a case-by-case basis. *Van Drivers v. Radigan & McGilly Moving & Storage Co.*, 8th Dist. Cuyahoga No. 51155, 1986 Ohio App. LEXIS 9158 (Nov. 20, 1986).

**{¶ 68}** A reviewing court will not reverse a trial court's decision on whether to award sanctions under R.C. 2323.51 or Civ.R. 11 absent a showing of an abuse of discretion. *DiFranco*, 144 Ohio St.3d 571, 2015-Ohio-4915, 45 N.E.3d 987, at ¶ 13; *Walters v. Carter*, 8th Dist. Cuyahoga No. 108555, 2020-Ohio-807, ¶ 17. An abuse of discretion occurs when the decision is unreasonable, arbitrary, or unconscionable or there is no sound reasoning process that would support the decision. *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

**{¶ 69}** However, it is "axiomatic [that] a court does not have discretion to misapply the law. A court has discretion to settle factual disputes or to manage its docket, for example, but it does not have discretion to apply the law incorrectly. That is why courts apply a de novo standard when reviewing issues of law." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 38, citing *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, 936 N.E.2d 481, ¶ 30. The Ohio Supreme Court has made it "clear that courts lack discretion to make errors of

law, particularly when the trial court's decision goes against the plain language of a statute or rule." *Id.* at ¶ 39.

{¶ 70} Appellees requested sanctions under both R.C. 2323.51 and Civ.R. 11, raising essentially the same arguments. Specifically, they contended that Bevan engaged in frivolous conduct under R.C. 2323.51(A)(2)(a)(i)-(iv) because (1) its litigation history and practice of filing lawsuits asserting successor liability but dismissing the actions prior to any court deciding the issue amounted to harassment; (2) Bevan was on notice that the Illinois court found no successor liability between Hallstar and C.P. Holding based on the same evidence that Bevan relied on in bringing the instant lawsuit and the prior lawsuits; and (3) Bevan's claim for fraudulent transfer is time-barred under the applicable four-year statute of limitations found in R.C. 1336.09. Based on the same foregoing arguments, appellees contend in this court that Bevan willfully violated Civ.R. 11 by naming them in the complaint as "successor in interest and liability to C.P. Hall" when Bevan did not have a reasonable and good-faith belief supporting its claim.

{¶ 71} The issue before the trial court and this court does not require a resolution of whether Hallstar or Ester are successors in interest of C.P. Hall. The issue before the trial court was whether Bevan had a good-faith belief, both objectively and subjectively, that Hallstar or Ester held successor liability of C.P. Hall. And the issue before this court is whether the trial court abused its discretion in finding that Bevan's conduct was sanctionable. Based on the record before this court, we find that the trial court's decision was unreasonable.

{¶ 72} The trial court's decision finding sanctions were warranted, relies solely on the Illinois court's decisions that found no successor liability regarding Hallstar. The trial court determined that Bevan's conduct of filing the instant lawsuit despite having knowledge of the Illinois decisions amounted to frivolous and harassing conduct. The court found that Bevan failed to demonstrate "that the Illinois court was erroneous or that our facts are different. The merits of the claim are clearly lacking and his persistent harassment of the defendants is clear." We find that the trial court's exclusive reliance on the Illinois decisions was unreasonable based on the record before this court and the applicable law.

{¶ 73} As previously discussed, Hallstar was named as a defendant in two Illinois lawsuits wherein the plaintiffs alleged exposure-related personal injury claims. Pertaining to Hallstar, those plaintiffs alleged that Hallstar was a successor of CPH Holding and C.P. Hall. Bevan was not counsel in the Illinois lawsuits but counsel for the appellees in the present case represented Hallstar in the Illinois lawsuits.

{¶ 74} The record contains a transcript of the Illinois court's verbal ruling justifying its determination that Hallstar holds no successor liability of CPH Holding and C.P. Hall. In that ruling, the Illinois court stated that the plaintiffs alleged in their complaints that

> Hallstar Company is liable to them as successor to CPH Holding and C.P. Hall Company. No facts are alleged in the complaint to support the relationship between the two entities. Hallstar has filed its motion for summary judgment arguing there is no successor liability.

As it relates to the issue of successor liability, the Court finds: One, in 1986 C.P. Hall was a subsidiary of CPH Holding; two, in 2004 there was a reorganization whereby CPH Holding owned CPH Sales which in turned owned C.P. Hall. CPH Holding did not directly own C.P. Hall; three, in 2007 CPH Holding became Hallstar. There was no change in ownership of C.P. Hall at the time which was still owned by CPH Sales; four, in 2008, there was a stock sale whereby C.P. Hall was sold to C.P. Hall Acquisitions. These findings are based upon the deposition testimony of [Paro] which was attached to and cited by counsel in their papers.

Plaintiffs, in their opposition, state that C.P. Hall was a subsidiary of CPH Holding until it redirected CPH Hall's assets and liabilities to other companies it created. This statement that C.P. Hall was a subsidiary of CPH Holding is true from the years 1986 to 2004. However, after 2004, CPH Sales became the owner of C.P. Hall, and that was true until 2009. In 2009, the stock sale between CPH Sales and CPH Acquisition took place, and Hallstar was not a party to that transaction. Based on those facts, the Court finds there is no successor liability.

*See Whittington v. Hone[y]well International, Inc.*; August 6, 2015, Tr. 2-4.[8] Other than the two handwritten decisions granting summary judgment to Hallstar against the Illinois plaintiffs, this transcript is the only evidence in our record pertaining to the Illinois lawsuits.

{¶ 75} In its decision in this case granting sanctions, the trial court stated:

At no time has [Bevan] permitted [its successor liability] theory to be tested; whenever a motion has been filed to test his contention, he has dismissed the case under Rule 41(A), as is his right. However, before this action was filed, an Illinois court squarely faced the theory that either defendant could be considered a successor in liability to C.P. Hall Co. and decided in favor of the defense. No longer could [Bevan] claim

---

[8] The court further found the plaintiffs' claim that Hallstar was liable under the "theory of direct-participant liability to be inapplicable" because "this is not a situation where Hallstar mandated a course of action, then authorized the manner in which it was to be undertaken resulting in a foreseeable injury to those [p]laintiffs."

that his theory was, at best, untested. Therefore, his actions in this case must be viewed in that conte[xt].

{¶ 76} The trial court found that Bevan needed to demonstrate why the court should not rely on the Illinois decision in deciding whether Bevan had a good-faith belief that either Hallstar or Ester were successors of C.P. Hall. According to the trial court, Bevan failed to do so. We disagree.

{¶ 77} In Bevan's brief opposing sanctions and supporting exhibits, it pointed out that the Illinois decision is not binding authority in Ohio, involved Illinois successor liability law — not Ohio law — and did not involve Ester. Bevan made similar assertions during the hearing. Accordingly, the record does not support the trial court's factual determination that Bevan "failed to demonstrate that the Illinois court was erroneous or that our facts are different." Granted, Bevan was unable during the hearing to fully articulate why the Illinois decisions are legally different, but Bevan explained in its brief in opposition that its theory on successor liability is based on Ohio law and not Illinois law. Accordingly, and as it will be discussed below, the trial court acted unreasonably in solely relying on the Illinois decisions to support its determination that Bevan engaged in sanctionable conduct.

{¶ 78} We agree with Bevan that the Illinois decisions are not binding precedent. Decisions by out-of-state courts are not binding upon Ohio courts, but may be persuasive or instructive. *Rhode v. Mkt. Ready Real Estate*, 10th Dist. Franklin No. 12AP-160, 2012-Ohio-5475, ¶ 19, citing *Ellington v. Gray Barrel & Drum, Inc.*, 8th Dist. Cuyahoga No. 75724, 1999 Ohio App. LEXIS 3121, 4 (July 1,

1999); *see also Pojman v. Columbia-Brookpark Mgt., LLC*, 8th Dist. Cuyahoga No. 88666, 2007-Ohio-4044 (identifying trial court's statement that out-of-court decisions are not binding, but instructive); *York v. Ohio State Hwy. Patrol*, 10th Dist. Franklin No. 89AP-143, 1990 Ohio App. LEXIS 1804, 10 (May 8, 1990) (recognizing out-of-court decisions may be persuasive).

{¶ 79} Appellees, as the movants, bore the burden of proving that sanctions were warranted under either R.C. 2323.51 or Civ.R. 11 and what weight the Illinois decisions should be afforded. If the Illinois decisions were indistinguishable, appellees were required to present that information to the court, i.e., that Illinois and Ohio's successor liability statutes are the same and that the evidence presented to the Illinois court on summary judgment was the same evidence that Bevan relies on to support its belief of successor liability. As previously stated, Bevan was not counsel for the plaintiffs in the Illinois lawsuits, but counsel for the appellees represented Hallstar in the Illinois lawsuit. Because the burden was with the appellees, we find the trial court's assertion that Bevan failed to "demonstrate that the Illinois court was erroneous or that our facts are different" was unreasonable. Bevan held no burden of proof on whether sanctions should be imposed. *See Foland v. Englewood*, 2d Dist. Montgomery No. 22940, 2010-Ohio-1905, ¶ 66 (burden rests on party seeking sanctions).

{¶ 80} We further find that the trial court's exclusive reliance on the Illinois decisions was unreasonable because the judgment entries and transcript reveal that only Hallstar was a defendant to the action — Ester was not a named defendant.

Accordingly, a determination that Hallstar is not a successor of C.P. Hall does not apply to Ester. Despite this distinction, the trial court found that "an Illinois court squarely faced the [successor liability] theory that *either defendant* could be considered a successor in liability to C.P. Hall Co. and decided in favor of the defense." (Emphasis added.) This factual determination is unsupported by the record. Although appellees have jointly defended this action, Hallstar and Ester are purportedly two separate entities. Accordingly, whether Ester is a successor in interest of C.P. Hall has not been adjudicated on the merits by any court and thus, no finding or award of sanctions should be attributed to any defense by Ester in this action; any finding to the contrary is unreasonable.

{¶ 81} Moreover, in reviewing the Illinois court's verbal decision, the Illinois plaintiffs seemingly raised two different theories why Hallstar should be liable to plaintiffs — (1) successor liability, and (2) direct-participant liability. In granting summary judgment in favor of Hallstar, the trial court rendered no legal analysis, but only made a legal conclusion based on the facts presented regarding Hallstar's successor liability. And although the Illinois court found Hallstar not liable under direct-participant liability, this cause of action is not recognized in Ohio. *See Root v. Stahl Scott Fetzer Co.*, 2017-Ohio-8398, 88 N.E.3d 980 (8th Dist.) (Ohio does not recognize direct-participant liability). It is unknown what the Illinois plaintiffs' complaint alleged and what documentary evidence the Illinois court considered in rendering its decision on Hallstar's motion for summary judgment. From the transcript, the Illinois court stated that "no facts are alleged in the complaint to

support the relationship between the entities." And it made its factual findings "based upon the deposition testimony of [Paro]." The Illinois court made no reference to any other evidence. Unlike in the Illinois cases, Bevan made several allegations supporting its belief about the relationship between Hallstar, Ester, and C.P. Hall. And based on the record before this court, additional information was discovered from Paro's 2015 deposition, which was subsequent to the filing of the Illinois lawsuits.

{¶ 82} Finally, this court cannot ignore that other law firms have or had the same belief that at least Hallstar is a successor in interest of C.P. Hall. This fact lends credence to Bevan's assertion that it had a good-faith belief to bring this cause of action. This fact also defeats appellees' assertion that Bevan's conduct was frivolous under R.C. 2323.51(A)(2)(a)(ii). Accordingly, we find that the trial court's exclusive reliance on the Illinois decision to support its determination that Bevan's conduct amounted to sanctionable conduct under R.C. 2323.51 or Civ.R. 11 was unreasonable.

{¶ 83} As for appellees' other grounds supporting its request for sanctions — the fraudulent transfer claim is time-barred under the applicable statute of limitations and Bevan's litigation practices and history — the trial court made no determination whether sanctions were warranted under these claims. Nevertheless, we will discuss them briefly below.

### B. Statute of Limitations

{¶ 84} Appellees contend that Bevan's conduct is frivolous under R.C. 2323.51(A)(2)(a)(ii)-(iv) because the claim is not warranted under existing law. In

support, appellees contend that plaintiff's fraudulent transfer claim is time-barred by the applicable four-year statute of limitations found in R.C. 1336.09.[9] According to appellees, the statute of limitations began on February 20, 2009, with the Stock Purchase Agreement and thus, the four-year period ran on February 20, 2013 — four years prior to the instant complaint being filed.

{¶ 85} Regarding R.C. 2323.51, whether a claim is warranted under existing law involves is an objective consideration — whether a reasonable attorney would have brought the claim under existing law. "'[A] claim is frivolous if it is absolutely clear that no reasonable lawyer could argue the claim.'" *Grimes*, 2019-Ohio-1365, 135 N.E.3d 378, at ¶ 30, quoting *Riston*, 149 Ohio App.3d 390, 2002-Ohio-2308, 777 N.E.2d 857, at ¶ 36.

{¶ 86} There is no dispute that asbestos-related supplier liability claims are viable in Ohio and the law may support liability against alleged successors in interest to corporations that commit civil wrongs. Bevan asserts that plaintiff's claim of successor liability was not brought under Ohio's Uniform Fraudulent Transfer Act promulgated under R.C. Chapter 1336, but under common law theory of successor liability, citing *Welco Industries, Inc. v. Applied Cos.*, 67 Ohio St. 3d 344, 617 N.E.2d 1129 (1993), syllabus. In *Welco*, the court held that "[a] corporation that purchases the assets of another is not liable for the contractual liabilities of its predecessor corporation *unless* (1) the buyer expressly or impliedly agrees to assume such

---

[9] Appellees do not identify which section of R.C. 1336.09 would apply.

liability; (2) the transaction amounts to a de facto consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability. (*Flaugher v. Cone Automatic Machine Co.*, 30 Ohio St. 3d 60, 507 N.E.2d 331, [1987] followed.)." *See also State ex rel. Crosset Co. v. Conrad*, 87 Ohio St.3d 467, 721 N.E.2d 986 (2000) (recognizing common-law principles of successor liability).

{¶ 87} We need not make a determination on the legal issue of whether the statute of limitations barred plaintiff's fraudulent transfer claim because even if this court would find that the statute of limitations applies and bars the fraudulent-transfer claim under *Welco*, Bevan also asserted that Hallstar and Ester are successors in interest under the other *Welco* theories — the transaction amounted to a de facto merger or was merely a continuation of the seller corporation. Again, this court is not deciding whether Bevan's client would prevail on her complaint, but only whether Bevan acted frivolously in filing the complaint or whether it had a good-faith belief these actions could be maintained against Hallstar and Ester. *See, e.g., Walters v. Carter*, 8th Dist. Cuyahoga No. 108555, 2020-Ohio-807, ¶ 35.

{¶ 88} As previously discussed, Bevan is not the only law firm that has brought claims against appellees as alleged successors in interest to C.P. Hall, a fact that appellees concede. Although the record demonstrates that those claims were eventually voluntarily dismissed against appellees, it cannot be found that a reasonable attorney would not bring such claims against appellees. Based on the foregoing, it appears that the asserted grounds in plaintiff's complaint against

Hallstar and Ester factually and legally meet the objective reasonable-lawyer test under R.C. 2323.51(A)(2)(a)(ii)-(iv).

### C. Litigation Practice and History

{¶ 89} Appellees also contend that Bevan's litigation practices and history constitute harassment and thus, frivolous conduct under R.C. 2323.51(A)(2)(a)(i). Under that subsection, conduct is frivolous when "it serves merely to harass or maliciously injure another party to the civil action or appeal or is for another improper purpose, including, but not limited to, causing unnecessary delay or needless increase in the cost of litigation." Appellees contend that Bevan's continued practice of filing lawsuits against appellees and then voluntarily dismissing them prior to an adjudication on the merits of successor liability constitutes harassment and causes a needless increase in the cost of litigation. In support, appellees maintain that the *Blakely* Court "cautioned" Bevan that the Illinois court's legal conclusion is "precedent" and puts all plaintiffs on notice regarding that appellees hold no successor liability for C.P. Hall.

{¶ 90} In its discussion of the case, the trial court noted that the underlying lawsuit was the sixth action brought by Bevan against appellees asserting successor liability.[10] It also noted that Bevan's dismissal pursuant to Civ.R. 41 was "[within its] right," but that based on the subsequent Illinois decision, Bevan's claims against appellees are meritless and constitute "persistent harassment."

---

[10] Subsequent to the underlying lawsuit, Bevan, on behalf of its client, has filed another asbestos-based claim in Summit County, Ohio naming multiple defendants, including appellees, individually and as successors in interest to C.P. Hall.

{¶ 91} It is a well-established rule under Civ.R. 41(A)(1)(a) that a plaintiff has an absolute right to voluntarily and unilaterally terminate his cause of action prior to the commencement of trial. *Van Drivers v. Radigan & McGilly Moving & Storage Co.*, 8th Dist. Cuyahoga No. 51155, 1986 Ohio App. LEXIS 9158 (Nov. 20, 1986), citing *Std. Oil Co. v. Grice*, 46 Ohio App. 2d 97, 345 N.E.2d 458 (2d Dist.1975); *see also Heard v. Meijer, Inc.*, 113 Ohio App.3d 224, 680 N.E.2d 719 (2d Dist.1996). But this absolute right does not absolve all conduct.

{¶ 92} In *Marshall v. Cooper & Elliott*, 2017-Ohio-4301, 82 N.E.3d 1205, ¶ 21 (8th Dist.), this court upheld a sanctions award against an attorney who dismissed his third-party complaint on the day of trial. This court acknowledged that a court retains jurisdiction to consider a motion for sanctions under R.C. 2323.51 after "a voluntary dismissal because, were it otherwise, 'a party could force a defendant to expend significant time and money to defend an arguably frivolous action and then dismiss that action just prior to trial with little if any consequence.' *[State ex rel. Richard Gaier Co., L.P.A. v. Kessler]*, 97 Ohio App.3d 782, 785, 647 N.E.2d 564 (2d Dist.1994); *see also [ABN AMRO Mtge. Group, Inc. v. Evans]*, 8th Dist. Cuyahoga No. 98777, 2013-Ohio-1557, at ¶ 21. 'In that circumstance, the goal of * * * R.C. 2323.51, which is to prevent parties from using the judicial process to harass one another, would be significantly less achievable.' *Gaier* at 785." *Id.*

{¶ 93} Based on the procedural posture alone, *Marshall* is distinguishable because Bevan voluntarily dismissed its complaint following appellees' motion for summary judgment, which not only challenged the successor liability theory but also

whether plaintiff could establish the exposure-causation component of her asbestos-related claim. Believing that plaintiff could not meet the causation requirement at the time, Bevan voluntarily dismissed the case without prejudice against appellees. This legal determination does not amount to an abuse of the judicial process.

{¶ 94} *Marshall* is also distinguishable because the sanctioned party maintained a fee dispute despite its knowledge of the law that the attorney was obligated under the rules of professional responsibility to arbitrate such disputes. Additionally, the sanctioned party conceded to the facts and circumstances in the trial court's decision, which included that the attorney's slander claim was not supported by credible evidence, from which the attorneys demonstrated no intent on pursuing.

{¶ 95} In this case, we find no such egregious and willful conduct and that Bevan's voluntarily dismissal in this case, and in the prior cases, is permissible under Civ.R. 41. Hundreds, if not thousands, of asbestos-related lawsuits have been filed in Ohio, including those filed by Bevan — a law firm that concentrates on asbestos-personal injury claims. Of those claims, only five lawsuits are the focus in this appeal, and each are different in nuanced ways. The *Bennett* lawsuit was the first one from our record where Bevan named Hallstar as a successor in interest of C.P. Hall. Although Hallstar filed for summary judgment, it did not make any argument pertaining to successor liability. In *Clark*, both Hallstar and Ester moved for dismissal under Civ.R. 12(B)(6), no discovery occurred prior to the filing, and Bevan dismissed this case six months after filing the lawsuit. In *Schwab*, Hallstar

immediately moved to remove the case to federal court; Hallstar and Ester were dismissed from the lawsuit within a month.

{¶ 96} The *Blakely* case was the first case where Bevan brought suit against both Hallstar and Ester as successors in interest to C.P. Hall. In *Blakely*, the parties litigated and defended their respective positions on the underlying issue through summary judgment and a subsequent hearing. Although Bevan ultimately dismissed the case before the *Blakely* Court could rule on the summary judgment motions, Bevan did not entirely avoid the issue of successor liability. The intervening Illinois lawsuits and appellees' threat of sanctions if Bevan did not dismiss the case apparently caused Bevan to make a strategic decision to dismiss the case against appellees. Additionally, we disagree with the *Blakely* Court's characterization of the "out-of-state" decision as "precedent," and with appellees' interpretation of the *Blakely* Court's footnote as a "caution" to Bevan or future Ohio plaintiffs regarding exposure to potential sanctionable conduct.

{¶ 97} Finally, the instant case does not push Bevan's litigation practice into frivolous and harassing conduct. Appellees' unopposed motion for summary judgment on the issues of successor liability and exposure-causation remained pending on the trial court's docket for seven months prior to Bevan dismissing the entire lawsuit. This is not a situation where immediately after appellees filed for summary judgment, Bevan dismissed the complaint. The opportunity for appellees to obtain a favorable judgment by an Ohio court presented itself.

**{¶ 98}** Based on the foregoing, we find that Bevan's current litigation practice and history did not rise to frivolous conduct under R.C. 2323.51(A)(2)(a)(i).

## IV. Conclusion

**{¶ 99}** According to the record before this court, including the trial court's justification for finding sanctions warranted, we find that the trial court's decision finding that Bevan engaged in sanctionable conduct under R.C. 2323.51 and Civ.R. 11 was unreasonable. Bevan's first assignment of error is sustained.

**{¶ 100}** The record before us demonstrates the frustration and animosity between Bevan and counsel for appellees. Understandably, the parties are passionate about their respective clients' positions on this issue. And although this court is reversing the trial court's decision and vacating the award of sanctions, we recognize that at some point the threshold determination of whether Hallstar and Ester are successors in interest of C.P. Hall will need to be decided by an Ohio court in order for Bevan's clients to continue a cause of action against appellees in Ohio.

**{¶ 101}** Having found merit to Bevan's first assignment of error, the remaining assignments of error challenging a discovery deadline and the trial court's determination of the sanctionable amount, are rendered moot. *See* App.R. 12(A)(1)(c).

**{¶ 102}** Judgment reversed.

It is ordered that appellants recover from appellees costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

ANITA LASTER MAYS, A.J., CONCURS;
SEAN C. GALLAGHER, J., CONCURS (WITH SEPARATE OPINION)

SEAN C. GALLAGHER, J., CONCURRING:

{¶ 103} I fully concur with the majority's analysis and conclusion but write separately to explain my decision in further detail. The majority is correct; the trial court placed undue weight on the nonbinding, out-of-state decision entered as between different parties in declaring Bevan's conduct to be wholly frivolous. Notwithstanding, Bevan in part has brought this scrutiny upon themselves. Bevan created an environment in which their conduct appears frivolous, to the point that treading carefully if there is any future litigation may not only be prudent, but quite necessary.

{¶ 104} There appears to be a pattern of including Hallstar and Ester in litigation that never ends in anything but voluntary dismissal of all claims. This is amplified by the fact that in the underlying litigation, despite having fully briefed the successor liability issue and having no change in circumstances following the conclusion of that briefing, Bevan entirely dismissed the action before a binding

decision on the topic could be rendered. This conduct creates a perception of impropriety, which unfortunately can garner more weight than impropriety itself. One can appreciate this leading the trial court to feel sanctions were warranted.

{¶ 105} Nevertheless, the trial court's decision was based on the Illinois state court decision, which, in no uncertain terms, cannot bind an Ohio court for the purposes of declaring that any action seeking a contrary decision in this state would be frivolous as a matter of law. Accordingly, I concur with the well-reasoned analysis presented by the majority.